**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY BAKER,** | : | **CIVIL ACTION** |
| *Petitioner*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SCI ROCKVIEW, et al.,** | : | |
| *Respondents*. | : | **NO.  21-cv-3216** |

<u>**MEMORANDUM**</u>

KENNEY, J.                                                                                      May 8, 2023

## I.      INTRODUCTION

Anthony Baker ("Petitioner") petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner alleges three instances of ineffective assistance of trial counsel which independently or, alternatively, cumulatively prejudiced Petitioner. The Honorable Magistrate Judge Elizabeth T. Hey recommends that the Court deny the petition. Ultimately, the Court adopts Judge Hey's well-reasoned Report and Recommendation and provides additional discussion here. The Court also denies a certificate of appealability.

## II.      BACKGROUND AND PROCEDURAL HISTORY

The factual and procedural background of this case outlined in the Report and Recommendation is reiterated here. ECF No. 21. On March 6, 2014, following a jury trial, Petitioner was convicted in the Court of Common Pleas of Philadelphia County for first-degree murder, carrying a firearm without a license, and possession of an instrument of crime. N.T. 03/06/14 at 11–12. These charges were based on the February 9, 2012 murder of David McClenic ("McClenic") on Marion Street in Philadelphia. *Commonwealth v. Baker*, 239 A.3d 67, at *1 (Pa. Super. July 14, 2020) (hereinafter "Super. Ct. Op.").

1

At trial, the Commonwealth (represented by Ms. Pescatore) presented the following evidence against Petitioner (represented by Mr. Tinari). McClenic called his girlfriend, Jaleesa Thomas ("Jaleesa") at approximately 1:00 a.m. on February 9, 2012. N.T. 02/25/14 (Volume I) [1] at 51–54. McClenic informed Jaleesa that he would be stopping by her home and, shortly thereafter, he called again to tell her he had arrived. *Id.* at 51–54. Jaleesa went to the side door of her house located near the intersection of Marion Street and Hansberry Street, at which point she saw McClenic exit an alleyway between the two streets. *Id.* at 53–54, 57–59. Jaleesa observed McClenic arguing with one of the several men loitering in the street, who she immediately recognized and later identified as Stephen Dickey ("Dickey"). *Id.* at 61–62. She also immediately recognized Petitioner as one of the men loitering nearby. *Id.* at 62–68. Indeed, Jaleesa was familiar with both men because she saw them near her home "just about every day" and, specifically, "hundreds of times." *Id.* at 64–69.

Jaleesa exited the house when she observed McClenic, Dickey, and an unidentified male physically fighting in the middle of Marion Street. *Id.* at 69–70. The noise of the fight caused Jaleesa's grandmother, mother, and sister to investigate. *Id.* at 166; N.T. 02/26/14 at 63, 84. After a brief pause in the fight, and despite Jaleesa's pleas, McClenic continued to argue with the men. N.T. 02/25/14 (Volume I) at 71, 75–76. At the same time, McClenic instructed Jaleesa to turn off his car's engine which was still running and was parked on Marion Street. *Id.* at 71. Jaleesa testified that she observed Petitioner standing closest to McClenic on her way to the car. *Id.* at 74–75. Moments later, Jaleesa heard several gunshots while she was in the car turning off the ignition. *Id.* According to Jaleesa's testimony, she turned her head to look outside the car and saw Petitioner

---

[1] The notes of testimony for February 25, 2014 are mislabeled in that Volume I contains witness testimony and Volume II contains jury instructions and opening statements. The Court refers to each volume as they are labeled.

chasing McClenic down Marion Street while repeatedly shooting. *Id.* at 77–78. McClenic then fell to the ground and by the time Jaleesa reached him he was no longer breathing. *Id.* at 80. Petitioner, Dickey, and the other unidentified men jumped into a white car that sped away immediately after the shooting. *Id.* at 79.  Jaleesa gave the police a physical description of Petitioner at the scene and, later that same morning, identified him in a photo lineup. *Id.* at 81–83.

Though some discrepancies were apparent between witnesses, much of Jaleesa's account was corroborated. Most notably, Jaleesa's sister, mother, and grandmother—Shavon Thomas ("Shavon"), Tamika Thomas Barnes ("Tamika"), and Jeanette Gorham ("Jeanette"), respectively—confirmed that they had seen Petitioner near the intersection of Marion Street and Hansberry Street many times previously. *Id.* at 173–74 (Shavon saw Petitioner "[h]anging out" in front of a nearby store on the few occasions she ventured outside); N.T. 02/26/14 at 49–50 (Tamika saw Petitioner "every other day" for two years prior.); *id.* at 91 (Jeanette saw Petitioner "just about every day."). Shavon observed the shooting in its entirety and identified Petitioner as the shooter. *Id.* Indeed, the physical description of the shooter provided by Shavon and Jeanette mere hours after McClenic's murder closely aligned with that of Jaleesa. *Compare* N.T. 02/25/14 (Volume I) at 135 (Jaleesa told police that same morning that the shooter "was wearing a black jacket, dark pants and hat, he had a Suni [type of beard]" and was "about five-five."), *with id.* at 179 (Shavon told police that "he had on all black, he was short, five-five, five-six, he had a goatee."), *and* N.T. 02/26/14 (Jeanette told the police that the shooter "was short, thin, [and] dark skin[ned]," and had "facial hair" that was described as both "a beard [and a] goatee."); *see also* N.T. 02/26/14 at 28 (Officer White's notes indicated that Jaleesa provided that the shooter was "approximately five-five" with "[a] beard, [and wearing] a hood and dark jeans."). Jeanette, who was standing approximately seven feet from the shooter, also identified Petitioner as the one responsible for

McClenic's death. N.T. 02/26/14 at 91–93. Though Tamika did not observe the shooting, she identified Petitioner as being at the scene of the altercation. *Id.* at 62.

Additionally, a medical examiner confirmed that the gunshot wounds indicated that McClenic sustained the first few gunshot wounds to his chest while facing the shooter, and then turned to run and was shot from behind in the back. N.T. 02/25/14 (Volume I) at 157. Further, two police officers familiar with the area at that time confirmed that Petitioner frequented the intersection of Marion Street and Hansberry Street in 2012. N.T.0 2/26/14 at 18–19 (placing Petitioner in the area multiple times per week); *id.* at 200 ("This is their neighborhood. They won't leave here.").

Moreover, Officers Welsh and Ganarilla testified that the weapon used in the shooting was recovered around the corner from the scene of the crime five months later as part of an unrelated narcotics investigation. *Id.* at 133–37, 163–67, 207–08.  Specifically, police recovered the murder weapon in July 2012 in connection to the arrest of a third-party (Antwine Warren). N.T. 02/26/14 at 231–35. However, it was not until 2014 that law enforcement connected the recovered weapon with the instant crime. *See id.* The chain of events was as follows: (1) on February 19, 2014 Mr. Tinari sent a letter to the prosecutor informing her that the weapon was recovered "on an individual who was arrested with it and lived in or around the area where the [Baker] event occurred"; (2) the prosecutor then alerted the detective assigned to the homicide investigation, Detective Marano, of the potentially recovered weapon; and (3) the firearm was located, tested, and linked to the ballistics evidence found at the homicide crime scene the week before Petitioner's trial. *Id.* at 207–08, 223, 235–38.

Detective Marano confirmed that he was not aware that the gun used in the McClenic homicide had been recovered until the week before trial. *Id.* at 207–08. On redirect, Detective

Marano testified that he never saw the letter at issue but was informed of its general contents by the prosecutor. *Id.* at 231. The prosecutor also asked if "we ever learn[ed] where this information that Mr. Tinari had [come] from," to which defense counsel objected. *Id.* at 231–32. Judge Byrd overruled the objection, but the prosecutor did not return to the question and Detective Marano offered no answer. *Id.* at 232. The prosecutor then entered defense counsel's letter, which was published to the jury following an off-the-record conversation. *Id.* at 233. The letter read as follows:

> Dear Ms. Pescatore; please be informed that I have just received information that the weapon that was used in the Baker event has been recovered. It is also my further information that the weapon was found on an individual who was arrested with it and who lived in or around the area where the event occurred. It appears to me that this may be extremely relevant in terms of discovery as well as an absolute necessity to formulate strategy for trial on behalf of defense. Please forward any discovery material regarding the arrest and confiscation of the weapon that correlates with the Anthony Baker matter.

*Id.* at 236–37.

Defense counsel presented three witnesses and, additionally, Petitioner took the stand. Cynthia Kinard ("Ms. Kinard") testified that she witnessed fighting in the street when she returned home from work, but she did not see the shooting itself. N.T. 02/28/14 (Volume I)[2] at 10. Like other witnesses, Ms. Kinard established that Petitioner frequently loitered in the neighborhood. *Id.* at 37. John Myers ("Mr. Myers") provided character testimony which was unremarkable other than revealing that Petitioner lived near Marion Street at the time of McClenic's death. *Id.* at 46–48. However, after being excused from the witness stand, Mr. Myers physically approached the

---

[2] The notes of testimony for February 28, 2014 are broken into two volumes, both of which are incorrectly labeled Volume I. For clarity, the Court refers to the first portion, containing witness testimony and jury instructions, as Volume I. The second portion, containing closing arguments, is referred to as Volume II.

prosecutor and told the jury that Petitioner was "a good kid." *Id.* at 48, 51–53 ("He came off the stand and approached my personal space."). The prosecutor immediately asked that Mr. Meyer's statement be stricken and that the witness be admonished. *Id.* at 48. Mr. Tinari then moved for a mistrial "because of the conduct of the prosecutor in the presence of the jury standing up, yelling at [the court] to admonish [the] witness," which the Court denied. *Id.* at 52.

Most notably, Mr. Tinari called Dickey to testify on Petitioner's behalf. On direct examination, Dickey testified that he was involved in a fistfight with McClenic and that Petitioner was present during the fight. N.T. 02/27/14 at 11–12. Dickey further provided that he did not see Petitioner with a gun, and he did not see who shot McClenic (though at other points he testified affirmatively that Petitioner was not the shooter). *Id.* at 14, 18, 71. Dickey also confirmed that several of the men at the scene were taller than Petitioner, which aligned with witness testimony that the shooter was relatively short. *Id.* at 15.

On cross examination, Ms. Pescatore used Dickey's prior guilty plea for impeachment purposes. *Id.* at 19–77. Dickey was a difficult witness; at several points he claimed that, despite being presented with a transcript of his guilty plea hearing indicating otherwise, he never pled guilty to conspiracy nor agreed to the Commonwealth's presentation of facts at this plea hearing. *See, e.g.*, *id.* at 19, 39–40. Indeed, Dickey claimed not to remember any significant portion of his plea hearing. *See id.* at 19–77. Dickey further evaded by claiming that he could not properly see the transcript, so the prosecutor read it into the record line-by-line. *Id.* at 21. Dickey testified that he could not remember both key portions of the plea hearing and the most innocuous and irrelevant portions. *Id.* at 25, 32 (testifying that he did not recall informing the judge that he had his GED, was an American citizen, and was not under the influence). However, Dickey did recall signing the guilty plea colloquy and recalled that the judge asked whether Dickey had reviewed everything

6

contained therein with an attorney. *Id.* at 32–33. Most importantly, Dickey did not remember the prosecutor reading the facts related to his crime into the record nor did he remember being asked by the judge if he "agree[d] in substance with those facts." *Id.* at 36–37.

Due to Dickey's lack of recollection, the prosecutor read into the record the following portion of Dickey's plea hearing:

> "On February 9, 2012 at approximately 1:29 a.m., Mr. David McClenic, 23 year-old male, was in the area of 129 West Hansberry Street. He was going to see his girlfriend, Jaleesa Thomas, who lived near that location. He stopped before he went to her house. He was in an alley that's across the street from where she lives and it seems that he went to that alley to urinate. At that point he got into an argument with this defendant about that and along with several other males that were with this defendant. They, Mr. Mclenic and this defendant, got into a fistfight. The beginning of that fight – the argument was partially heard and the beginning of that fight wasn't totally witnessed, but Ms. Thomas did witness this defendant fighting with Mr. McClenic. That fight went on for some time. . . . Basically [Mr. McClenic] told the group that they were always talking about guns and killing people but none of them will fight him. **At that point, another male by the name of Anthony Baker produced a handgun and shot Mr. McClenic 14 times, killing him.** He was pronounced dead at the scene. Your Honor, this defendant was arrested a few days later and **he was charged with his role in the assault that preceded the murder of Mr. McClenic by Mr. Baker.**"

*Id.* at 34–36 (emphasis added). However, according to Dickey, "[t]he DA never said that." *Id.* at 44. When the prosecutor pointed to the page and line of the plea hearing transcript and asked whether the above referenced passage appeared on the page, Dickey said "no" and then claimed he could not read the words. *Id.* at 44–45. After again reading the facts set forth at the plea hearing, the following interaction took place between Dickey and the prosecutor:

> **Q:** Do you recall the DA, Mr. McCloskey, reading those facts in?
> **A:** No.
> **Q:** Do you recall the judge then asking you: "Very well. Did you hear those facts, sir?"
> **A:** No.

7

> **Q:** Your answer was: "Yes." Do you recall that?
> **A:** No.
> **Q:** "The Court: 'Do you agree in substance with those facts?'" Do
> you recall being asked that question?
> **A:** No.
> **Q:** Your answer was: "Yes." Do you recall that?
> **A:** No.

Indeed, Dickey was adamant that "[t]he DA never read to [him] that Anthony Baker shot [McClenic]." *Id.* at 76. Additionally, after some back and forth, Petitioner's counsel and the prosecutor stipulated that Dickey's counsel at the plea hearing did not object to the recitation of the facts, nor any portion of the facts contained therein. *Id.* at 47. Though Dickey's evasive testimony was most notable as to his plea hearing, this was not an isolated incident.[3]

On redirect, Petitioner's counsel rehabilitated Dickey by eliciting testimony that Dickey cannot read well and, at the time of the plea, did not comprehend what it meant to agree "in substance" with the facts set forth by the prosecutor. *Id.* at 71–72. Indeed, Dickey testified that he agreed to the facts set forth as they pertained to his actions and that he never actually told the judge that Petitioner shot McClenic. *Id.* at 70, 72. The testimony elicited also implied that Dickey was motivated to do whatever it took to plead guilty and get out of jail the day of the plea hearing. *Id.* at 70.

Finally, Petitioner took the stand and quickly corroborated that he and Dickey were both present near Marion Street and Hansberry Street the night of February 9, 2012. N.T. 02/28/14 (Volume I) at 60. Petitioner testified that he had facial hair in February 2012, as described by other witnesses, though he clarified that it was not a full beard. *Id.* at 67. Though Petitioner knew all of

---

[3] For example, he claimed not to know someone by the name of Malik Rodgers ("Rodgers"), despite jail records indicating that Rodgers had visited Dickey in jail over ten times. *Id.* at 58–60. Similarly, despite telling Petitioner's counsel that he knew the street names of the other men at the scene, he steadfastly claimed that he did not remember their identities or where they went after the shooting. *See id.* at 66.

the men present that night by either full or street name, he testified that he did not see who shot McClenic and implied that he did not know the shooter's identity. *Id.* at 65, 68–69.

On cross-examination, the following interaction took place:

> **Q:** When is it that you found out that you were actually wanted?
> **A:** Like a day – it came on the news, I think, the next day. Yeah, like the next day.
> **Q:** You mean the news, like over the radio or TV?
> **A:** The news TV. The broadcaster, he was on the TV. He was saying this guy is wanted for first degree murder and he is armed and dangerous. I got scared.
> **Q:** You got scared because you knew you did it.
> **A:** No, because cops out here killing people.
> **Q:** No. You were out there killing people.

*Id.* at 83–84. Mr. Tinari then objected for "trying to badger the witness." *Id.* at 84. Judge Byrd chastised defense counsel by reminding him "I will not tell you again[,] [j]ust say 'Objection' and I will rule." *Id.* This admonishment came after Judge Byrd had instructed defense counsel many times to only say "objection." *See, e.g.*, N.T. 02/27/14 at 49 ("Please don't interrupt. If you have an objection, stand and say 'Objection.' I will rule. You know speaking objections are not permitted.").

Petitioner further testified that, despite being aware that he was wanted by law enforcement, he evaded police for approximately one year. N.T. 02/28/14 (Volume I) at 85. Additionally, when the police determined his whereabouts, Petitioner attempted to flee by "jump[ing] off of one roof onto another roof" and made use of a blanket to hide under a pile of trash. *Id.* at 92. Indeed, this corroborated Detective Venson's prior testimony. N.T. 02/26/14 at 191 ("[A] pile of trash with a rug over top of it [was moving] . . . We toss the trash off and carpet off and there is [Petitioner] hiding underneath the rug and trash."). Moreover, Petitioner corroborated that he and Jaleesa had previously interacted near Marion Street. N.T. 02/28/14 (Volume I) at 81.

The case proceeded to closing arguments and, in relevant part, Petitioner's counsel argued that Dickey "was in jail at the time he entered his plea" and "got out of jail the moment the plea was accepted." N.T. 02/28/14 (Volume II) at 41. Counsel asked the jury, "Do you think at all that he was thinking about what was being said by the prosecutor?" *Id.* Counsel argued that the particular phrase—"in substance"—was important because Dickey was pleading to simple assault and conspiracy to simple assault, not conspiracy to murder. *Id.* at 41–42. Put simply, Dickey "did what he did at the time of the plea to get out of jail" by agreeing to the plea, but *he* never personally said that Petitioner shot McClenic and indeed, when under oath at Petitioner's trial, testified to the contrary. *Id.* Petitioner's counsel also argued that the murder weapon implicated another man and, more relevant to this petition, he also criticized the homicide investigation by remarking that the gun had been "in the hands of the Commonwealth" but it took a letter from defense counsel for the Commonwealth to connect the dots. *See id.* at 34–36. Indeed, Mr. Tinari suggested that there was "a total lack of doing what should have been done." *Id.* at 36.

Though the prosecutor referred to Dickey's testimony, a line-by-line review of the transcript reveals that nearly ninety percent of the Commonwealth's closing argument relied upon other evidence. *Compare id.* at 54–75 (the entirety of the Commonwealth's closing argument), *with id.* at 55–56, 67–69 (portions discussing Dickey). Additionally, over Mr. Tinari's objections, the prosecutor suggested that Mr. Tinari knew of the gun's recovery because Petitioner informed him of such, and that Petitioner did so to "pin" the McClenic shooting on someone else. *Id.* at 71 ("The police department didn't even know it was the same gun. They knew it was the same gun. Don't you have to scratch your head and say: How come? . . . You think his client told him? You think his client was trying to pin it on the other guy . . .").

The Court provided standard jury instructions including, in relevant part, that "statements made by the attorneys [do] not constitute evidence and therefore [are] not binding," with the exception of stipulated facts. N.T. 02/28/14 (Volume I) at 116. The jury then began deliberating. On the first day of deliberations, the jury informed the court that it was unable to reach a unanimous verdict. N.T. 03/04/14 at 13 (A note was delivered reading "Judge, we are at an impasse. We feel this matter will not be resolved."). At the request of Petitioner's counsel, the jury was then released for the day. *Id.* at 13–14. The following day, the jury submitted a second note in which it provided that "after further deliberation [the jury] came to a hopeless deadlock." N.T. 03/05/14 at 4. Petitioner's counsel moved for a mistrial and requested a *Spencer* charge. *Id.* at 4–5. Judge Byrd denied the motion for mistrial and denied the request for a *Spencer* charge as premature. *Id.* The court then instructed the jury to take a lunch break and freshen up before continuing deliberations. *Id.* at 7. That same afternoon, the jury provided a third note stating that they had "readdressed the issue as instructed and [they were] still at the same impasse." *Id.* at 8. Petitioner's counsel again moved for a mistrial, arguing that a *Spencer* charge would no longer be effective. *Id.* at 8–9. However, the Commonwealth moved for a *Spencer* charge. *Id.* at 9.

Judge Byrd then conferred with the foreman who indicated that there was no "reasonable probability" that the jury would reach a unanimous verdict on all of the charges. *Id.* at 12. Judge Byrd then delivered a *Spencer* charge and dismissed the jury for the day. *Id.* at 12–14. The following day, the jury requested that Jaleesa's testimony be read in its entirety. N.T. 03/06/14 at 8. Later that day, and after approximately thirteen hours of deliberations across several days, the jury returned a unanimous guilty verdict. *Id.* at 9–12. Following Petitioner's conviction, Judge Byrd sentenced Petitioner to life imprisonment for murder to run concurrently with a total prison term of six to twelve years on the other counts. *Id.* at 23.

Petitioner filed a direct appeal asserting that the trial court erred in denying a motion for mistrial based on the prosecutor's conduct when asking the trial court to admonish a witness and because the jury was unable to reach a unanimous verdict after several attempts. *Commonwealth v. Baker*, CP-51-CR0003700-2013, Statement of Matters Complained of on Appeal (March 30, 2015). The Superior Court affirmed the judgment of sentence on October 12, 2016. *Commonwealth v. Baker*, No. 764 EDA 2015, 2016 WL 5939457 (Pa. Super. Oct. 12, 2016). The Pennsylvania Supreme Court denied Petitioner's request for allowance of appeal. *Commonwealth v. Baker*, 169 A.3d 33 (Pa. March 31, 2017).

On November 13, 2017, Petitioner filed a PCRA petition, which retained counsel amended on June 22, 2018. *Commonwealth v. Baker*, CP-51-CR-0003700-2013, Amended Petition (Phila. C.C.P. June 22, 2018). Petitioner asserted claims for ineffective assistance of counsel ("IAC") based on: (1) introducing inculpatory evidence by calling Dickey as a defense witness; (2) failing to file a motion *in limine* to preclude admission of the fact that Mr. Tinari alerted the prosecution to the recovery of the murder weapon; (3) failing to object to the prosecutor's bad character evidence; and (4) failing to present meritorious issues on appeal challenging the introduction of victim impact evidence and that witnesses moved from the neighborhood after the shooting. *Commonwealth v. Baker*, CP-51-CR-0003700-2013, Petitioner's Memorandum of Law (Phila. C.C.P. Aug. 2, 2019). Additionally, Petitioner argued that the court should consider the cumulative effect of prejudice. *Id.* Following an evidentiary hearing, Judge Byrd dismissed Petitioner's PCRA petition on September 27, 2019. *Commonwealth v. Baker*, CP-51-CR-0003700-2013, Findings of Fact and Conclusions of Law (Phila. C.C.P. Sept. 27, 2019) ("PCRA Ct. Op."). Petitioner appealed and the Superior Court affirmed on July 14, 2020. *Commonwealth v. Baker*, 239 A.3d 67 (Pa. Super. July 14, 2020). Petitioner then appealed to the Pennsylvania Supreme Court and, again, the

lower court was affirmed on June 8, 2021. *Commonwealth v. Baker*, 256 A.3d 429 (Pa. June 8, 2021) (table).

On July 20, 2021, Petitioner filed a timely and counseled petition for habeas corpus. ECF No. 1. The petition presents the following claims: (1) IAC for calling Dickey, whose testimony provided substantive evidence of guilt; (2) IAC for failing to file a motion *in limine* to preclude the Commonwealth from presenting evidence that Mr. Tinari had informed the prosecution about the recovered murder weapon; (3) IAC for failing to object to the prosecutor's statement about Petitioner's character and bad acts; and (4) cumulative prejudice for the referenced instances of IAC. *Id.* at 18–19, 67–85. The Commonwealth filed an opposition on April 4, 2022, to which Petitioner responded on April 28, 2022. ECF Nos. 15, 19. This case was referred to the Honorable Judge Hey for a Report and Recommendation, which was issued on November 29, 2022. ECF No. 21. Judge Hey recommended that the petition be denied, and Petitioner submitted objections on January 4, 2022. ECF Nos. 21, 25. Petitioner's request for habeas relief is now ripe for consideration.

## III.    STANDARD OF REVIEW

The federal courts' power to grant habeas relief is limited. A court cannot grant habeas relief unless the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). State court determinations are presumed to be correct and are given great deference. *Rice v. Collins*, 546 U.S. 333, 344 (2006) (Breyer, J., concurring) (citing 28 U.S.C. § 2254(d)(2)). However, that deference is not unlimited. *See Saranchak v. Sec'y Pa. Dep't of Corr.*,

802 F.3d 579, 599 (3d Cir. 2015) (Federal habeas courts "accord no deference to a state court's resolution of a claim if that resolution was contrary to or reflected an unreasonable application of clearly established Supreme Court precedent," in which case the federal court reviews the underlying claim *de novo*.). To prevail in demonstrating that a state court result was contrary to clearly established federal law, Petitioner must demonstrate that the state court's application of federal law was "objectively unreasonable" as opposed to "merely incorrect." *Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 252 (3d Cir. 2020). Indeed, Supreme Court precedent must require a contrary outcome. *See id.*

For habeas petitions that claim ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner must show that counsel's representation "fell below an objective standard of reasonableness" and that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In establishing the first prong, Petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.  In other words, counsel's errors were "so serious as to deprive the defendant of a fair trial." *Id.* Courts "evaluate the conduct from counsel's perspective at the time," rather than with the benefit of hindsight, and "apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

Second, the petitioner must show prejudice resulting from counsel's deficient performance, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United Sates v. Scripps*, 961 F.3d 626, 632 (3d Cir. 2020). Indeed, the petitioner must show that counsel's error actually had an adverse impact on the

defense. *See Strickland*, 488 U.S. at 693. An error at trial is harmless if it did not substantially and injuriously impact the jury's verdict. *Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008) (internal quotations omitted). The Court considers the totality of the evidence before the jury in determining prejudice and determines whether, in the absence of the errors, it is reasonably likely that the decision would have been different. *Strickland*, 488 U.S. at 696. If an ineffectiveness claim is more easily disposed of on the ground of lack of sufficient prejudice, the Court is instructed to take this approach and need not address the deficient performance prong. *Id.* at 697.

Finally, "[e]rrors that do not individually warrant habeas relief may do so when combined if their cumulative prejudice undermines the fundamental fairness of the trial." *Whitney v. Horn*, 99-cv-1993, 2008 WL 4761733, at *15 (E.D. Pa. Oct. 30, 2008) (citing *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008)). Cumulative errors are "not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Fahy*, 516 F.3d at 205 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). In other words, the Court is required to "aggregate the prejudice caused by all the instances of error or counsel's deficient performance." *Moore v. Wakefield*, No.19-cv-576, 2021 WL 7711234, at *25 (E.D. Pa. March 30, 2021). However, "cumulative review is proper under *Strickland* only after the petitioner's claims surmount the first prong of the *Strickland* analysis." *Pursell v. Horn*, 187 F. Supp. 2d 260, 363 (W.D. Pa. 2022).

## IV.    DISCUSSION

Petitioner asserts three independent claims of IAC and a claim of cumulative prejudice. Petitioner's claims do not support habeas relief for the reasons set forth below.

### a.  Dickey's Testimony

Petitioner asserts that Mr. Tinari's decision to call Dickey and failure to review Dickey's plea colloquy amounts to ineffective assistance of counsel. Significant energy is expended on whether Mr. Tinari reviewed the transcript of Dickey's plea colloquy prior to calling him as a witness and whether the decision to call Dickey was objectively unreasonable. The Court need not make a determination as to the deficient performance prong of *Strickland* because, even assuming *arguendo* that Mr. Tinari's representation was deficient, Petitioner has not met his burden on the second prong. *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

As to the second prong, Petitioner alleges that the Superior Court conducted a sufficiency analysis[4] rather than determining whether there is a reasonable probability that the outcome would have been different absent counsel's errors. *See id.* at 694. Here, the Superior Court described the appropriate standard when it found that "the record fails to support [Petitioner's] argument that *but for counsel's decision to call Dickey* to the witness stand there would have been a *reasonable probability* of a different outcome." Super. Ct. Op. at *4 (emphasis added); *see also* Super. Ct. Op. at *8 ("[T]he record fails to support Appellant's argument that but for counsel's decision to call Dickey to the witness stand there would have been a reasonable probability of a different outcome."). To the extent that the Superior Court misstated the appropriate standard, discussed *infra* Section IV(d), the purported "misstatement" was made in reference to another argument rather than those based on Dickey's testimony.

---

[4] The sufficiency analysis asks whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

In its analysis, the Superior Court assessed the strengths and weaknesses of the Commonwealth's case against Petitioner. Super. Ct. Op. at *8–17. The strengths included the eye-witness testimony of four people who witnessed the fight or shooting from just several feet away and unequivocally identified Petitioner in court. *Id.* at *8. Most importantly, according to the Superior Court, was Jaleesa's testimony which was read back to the jury shortly before it reached a final verdict. *Id.* at *10. The Superior Court noted Jaleesa's inconsistent testimony regarding the height of the shooter. *Id.* at *12. However, Jaleesa's initial statement to the investigators—taken the night of the shooting—aligned with her trial testimony. *Id.* at *13. Moreover, the Superior Court noted that Jaleesa's testimony was largely corroborated by other witnesses. *Id.* at *14–15.

Despite Petitioner's argument that the Superior Court's analysis was one-sided, the Superior Court also discussed the inconsistencies between the witnesses' recollection of the shooting, the fleeting suggestion by the defense that the women's recollections were marred by discussions after the shooting, and the lengthy deliberations. *Id.* at *5, *17. Ultimately, however, the Superior Court found that the Thomas family's testimony on the crucial issue of the shooter's identity was "consistent and unwavering." *Id.* Accordingly, the Superior Court could not "agree with [Petitioner's] assertion that the defense had 'impeached the Commonwealth's eyewitnesses' to such a degree that the introduction of Dickey's colloquy took on a 'destructive' quality so as to result in 'inevitable and overwhelming' prejudice." *Id.* at *17. As an initial matter, the Court applies deferential review under Section 2254 because, as cabined to this claim, the Superior Court utilized the correct standard, and its decision was a reasonable application of *Strickland* and a reasonable determination of the facts.

Petitioner here asserts that two factors indicating prejudice were overlooked by the Superior Court, and subsequently the Magistrate Judge. ECF No. 25 at 8–9. For the sake of

17

completeness, the Court takes each in turn. First, the Court considers the jury's difficulty in reaching a verdict. Petitioner is correct that "the length of jury deliberations *may be one consideration* in assessing the strength of the prosecution's case." *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 807 (3d Cir. 2020) (emphasis added). The Third Circuit instructs that this factor is particularly compelling where the deliberation lasted longer than the trial, where the jury seeks guidance as to the treatment of the evidence or instructions at issue, and, importantly, where the trial evidence is otherwise "not overwhelming." *See id.* at 805–07; *see also Moore v. Rivello*, No. 20-cv-838, 2022 WL 1749250, at *21 (E.D. Pa. May 31, 2022) (finding prejudice where "the jury deliberated for longer than the length of trial, had numerous questions about the evidence, deadlocked, and requested further guidance as to the charges").

Though the jury deliberated for three days, this is *shorter* than the trial itself. At most, the length of deliberation reflects the time necessary to consider all evidence brought out during a lengthy homicide trial implicating a significant sentence. Additionally, though the jury asked for clarification or guidance during deliberations, it did not seek any supplemental information or instruction as to Dickey's testimony. Crucially, setting aside Dickey's testimony, the evidence against Petitioner was overwhelming. Petitioner notes that the analysis of the Superior Court and Magistrate Judge finding that the jury was ultimately convinced by Jaleesa's testimony rather than that of Dickey is "pure speculation." ECF No. 25 at 9. Yet, it would likewise be "pure speculation" to attribute the guilty verdict to Dickey's testimony (which the jury never followed up about during

deliberations) when there was overwhelming evidence against Petitioner.[5] Because several of the facts present in *Johnson* are not present here, the Court deems the length of jury deliberations of only minimal consequence.

Additionally, Petitioner argues that the prosecutor's central reliance on the Dickey testimony in closing arguments indicates prejudice. ECF No. 25 at 5. Indeed, Petitioner alleges that a "*full quarter of the closing argument* was focused on the Dickey testimony." *Id.* (emphasis original). This is incorrect. The prosecutor's closing argument spans 502 lines of the trial transcript. N.T. 02/28/14 (Volume II) at 54–75. The portions even remotely related to Dickey's testimony are limited to only 69 lines of the trial transcript. *See id.* at 55–56, 67–69. Even rounding up, this comes nowhere close to a quarter of the Commonwealth's closing arguments. Moreover, Petitioner's argument is misplaced. If the Commonwealth centrally relied on any evidence in closing it was the testimony of three women: Jaleesa, Shavon, and Jeanette. According to the Commonwealth, "[b]ased on their testimony alone you can convict Anthony Baker." *Id.* at 75.

The Third Circuit defines a "reasonable probability" as a probability "sufficient to undermine confidence in the outcome." *Rolan v. Vaugh*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Hull v. Kyler*, 190 F.3d 88, 110) (3d Cir. 1999)). Naturally, when the evidence is weighed, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. That is not the

---

[5] To list the most overwhelming evidence: (1) Jaleesa's eyewitness account of the shooting from mere feet away and implicating Petitioner, who was previously known to her; (2) the same of Shavon; (3) the same of Jeanette; (4) Jaleesa's identification of Petitioner in a photo lineup mere hours after the shooting; (5) the same of Shavon; (6) Petitioner's corroborating testimony placing him at the scene of the crime; (7) that Petitioner evaded police for approximately one year, despite knowing that he was wanted; and (8) defense witness Ms. Kinard who was unable to confirm that the shooter was someone other than Petitioner. That is to say nothing of the credibility of each witness, which is a determination most appropriately left to the jury.

case here, where the evidence against Petitioner was overwhelming. *Supra* note 4. Accordingly, even if counsel's decision to call Dickey to the stand was objectively unreasonable, Petitioner fails to show that there is a reasonable probability that *but for* this decision, there would have been a different outcome. Because Petitioner has not shown prejudice, habeas relief based on Mr. Tinari's representation related to Dickey's testimony is inappropriate.

### b. Defense Counsel's Letter

Petitioner next contends that Mr. Tinari was ineffective for failing to move to preclude evidence that Mr. Tinari alerted the Commonwealth to the recovery of the murder weapon. ECF No. 19 at 5–8. Mr. Tinari's lack of a motion *in limine* was neither a deficient performance nor prejudicial. Accordingly, habeas relief on this ground is not warranted.

The Court largely agrees with Petitioner that the Superior Court missed the crux of his argument in its analysis. On the first *Strickland* prong, the Superior Court provided that "the only purpose behind counsel's disclosure to the prosecution [that] the gun was used by someone else in a subsequent crime was to connect the gun's possession to someone other than Appellant." Super. Ct. Op. at *19. The Superior Court summarily found that this was "a reasonable trial strategy." *Id.* Yet, Petitioner does not allege that *defense counsel's disclosure* to the government was generally ineffective. Instead, the question posed by Petitioner is whether Mr. Tinari's decision not to foreclose admission of evidence related to *his communication* with the prosecutor about the recovered weapon represented a reasonable trial strategy.

The Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and compared to "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Indeed, "[j]udicial scrutiny of counsel's performance must be highly deferential," in part due to "the wide latitude counsel

must have in making tactical decisions." *Id.* Petitioner can rebut the presumption in favor of counsel by "showing either that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound." *Thomas v. Varner*, 428 F.3d 491, 499 (3d Cir. 2005). In other words, "[i]n cases in which the record does not explicitly disclose trial counsel's actual strategy or lack thereof . . . the presumption may only be rebutted through a showing that no strategy posited by the Commonwealth could have supported the conduct." *Id.* at 500 (internal citations omitted). The record is confusing as to defense counsel's strategy but, viewed in light of the deference granted to defense counsel, the purported strategies related to the recovered weapon were: (1) "to establish that [Petitioner] was not the person who possessed the gun" because it was "found with an individual in the location of an alley"; and (2) to "establish that the investigation by the Commonwealth was [in]sufficient." N.T. 05/03/19 at 18–19.[6] Though the record from the evidentiary hearing could be clearer, the Court does not find that Petitioner has shown that Mr. Tinari's failure to move *in limine* was not, in fact, part of any strategy. *See Thomas*, 428 F.3d at 500.[7]

Accordingly, the Court defers to Mr. Tinari's tactical decision to use the letter to imply that the investigation was mishandled. In *Thomas*, the Third Circuit held that counsel's failure to move to suppress identification evidence was unreasonable even though counsel purportedly had a strategy to cross-examine the witness on improper police efforts in obtaining the identification. 428 F.3d 491, 500 (3d Cir. 2005). Unlike in *Thomas*, however, one of the ways in which Mr. Tinari

---

[6] The transcript contains what is surely a misstatement by counsel or a typographical error, in that it reflects that defense counsel attempted to show that the Commonwealth's investigation was "sufficient." Because this does not comport with related testimony or the aims of defense counsel generally, the Court is confident that the intended word was "insufficient."

[7] However, even if Petitioner had made such a showing, the Commonwealth has posited a sound strategy that could support defense counsel's conduct: that the letter was useful in undermining the entire investigation. *See Thomas*, 428 F.3d at 500; *see also* ECF No. 15 at 16.

employed the recovered weapon evidence would not have been possible if the source of the information was not before the jury. Namely, Mr. Tinari's attempt to cast doubt on the entirety of the investigation was based on the evidence that law enforcement was not aware that the murder weapon had been recovered *until defense counsel alerted them of such*. *See* N.T. at 35–36. Indeed the facts of this case show that: (1) reference to counsel's communication with the prosecutor was necessary to argue that the investigation was mishandled; (2) the letter did not divulge the manner in which Mr. Tinari came to be aware of the recovered weapon; and (3) attorney-client privilege would clearly protect specific discussions, if any did occur, where Petitioner informed Mr. Tinari of the recovered weapon. Despite what Petitioner might think of this strategy with the benefit of hindsight, "[t]here are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way"; Mr. Tinari's strategy here was not objectively unreasonable. *See Strickland*, 466 U.S. at 689.

Petitioner further asserts that *Commonwealth v. Stenhach*, 514 A.2d 114 (Pa. Super. 1986) is controlling. In *Stenhach*, two defense attorneys appealed their own convictions for hindering prosecution and tampering with evidence arising from their representation of a defendant in a murder trial. *Id.* at 115. While representing their client, the attorneys recovered a rifle used in the homicide and, misunderstanding their legal and ethical obligations, did not deliver it to the prosecutor until ordered to do so. *Id.* Following their client's conviction, the attorneys were convicted of hindering prosecution, among other crimes. *Id.* On appeal, the Superior Court held that the statutes under which they were convicted were unconstitutionally overbroad as applied to criminal defense attorneys. *Id.* at 116. In so ruling, the Superior Court discussed similar cases from other jurisdictions examining the duties of attorneys who are in possession of incriminating physical evidence obtained from their clients. *Id.* at 120–23. Those cases provided a nearly

consistent rule, which the Superior Court adopted. In relevant part, the rule provides that a criminal defense attorney in possession of physical evidence incriminating his client, who cannot properly return the evidence to its source,[8] "must deliver it to the prosecution on his own motion" and, in this scenario, "the prosecution is entitled to use the physical evidence as well as information pertaining to its condition, location and discovery *but may not disclose to a fact-finder the source of the evidence*." *Id.* at 123 (emphasis added).

There are a few issues with Petitioner's reliance upon *Stenhach*. First, the facts here are different in that Mr. Tinari was not in possession of any physical evidence and, therefore, was not confronted with the ethical dilemma present in *Stenhach* and the cases cited therein. Rather, the police were already in possession of the physical evidence and, if counsel was "in possession" of anything, it was the knowledge that the recovered weapon was also implicated in Petitioner's case. There can be no question that counsel acted reasonably in alerting the Commonwealth to the connection, especially when such information was potentially helpful to Petitioner's case. Second, even importing the general principles espoused in *Stenhach* to this factually distinct scenario, the rule in *Stenhach* places no affirmative duty *on defense counsel*. Indeed, it is the prosecutor who "may not" disclose the source of the information; this rule does not require that defense counsel move *in limine* to prohibit the Commonwealth from disclosing information that, by Petitioner's logic, the Commonwealth was already barred from introducing. If anything, the principle of *Stenhach* bolsters the reasonableness of Mr. Tinari's lack of a motion *in limine*, particularly when counsel's related trial objections are considered.

---

[8] The rule provides that the attorney may "return [the evidence] to its source if he can do so without hindering the apprehension, prosecution, conviction or punishment of another and without altering destroying or concealing it or impairing its verity or availability in any pending or imminent investigation or proceeding." *Id.* at 123.

23

Indeed, on both occasions where the Commonwealth attempted to use Mr. Tinari's knowledge of and communication regarding the recovered weapon in the most prejudicial way possible—i.e. implying or asserting that Petitioner tipped off counsel in an effort to "pin" someone else for the homicide—Mr. Tinari did, indeed, object.[9] And, on both occasions, defense counsel's objections were overruled: first, when questioning Detective Marano (N.T. 02/26/14 at 231 –32 ("Did we ever learn where this information that Mr. Tinari had [come] from?")); and second, in closing, when the prosecutor posed a series of rhetorical questions to the jury. N.T. 02/28/14 (Volume II) at 71 ("How come Mr. Tinari knew this gun was recovered? You think his client told him? You think his client was trying to pin it on the other guy . . ."). Accordingly, defense counsel's lack of a preemptive motion *in limine*, but timely and reasonable objections, upheld the tenet of *Stenhach*: if a criminal defense attorney delivers evidence to the prosecution, *the prosecutor* may not use the source of its information in a manner which might be prejudicial to the defendant.

The Court recognizes that the Superior Court's analysis on this prong was limited but, for the reasons described here, the Superior Court's ultimate conclusion as to the deficiency prong of *Strickland* was not an unreasonable determination. Moreover, the Superior Court correctly concluded that counsel's performance in this regard, even if deficient, was not prejudicial. Super. Ct. Op. at *19. As summarized by the Report and Recommendation: (1) there was no evidence regarding the source of defense counsel's knowledge regarding the gun, nor that Petitioner informed his counsel about the same; and (2) the prosecutor's suggestion during closing argument regarding the source of Mr. Tinari's knowledge was merely speculation. ECF No. 21 at 26–27. As discussed *supra* Section IV(a), the evidence against Petitioner was overwhelming. There is not a

---

[9] Petitioner incorrectly asserts that the prosecutor made such statements without objection. ECF No. 25 at 11. This is an incomplete reading of the record.

reasonable probability that, but for counsel's failure to move *in limine* on this issue, the result of the proceeding would have been different. *See Strickland*, 466 U.S at 694. Because Petitioner's second argument fails on both *Strickland* prongs, habeas relief is inappropriate.

### c.  Prosecutor's Questioning of Defendant

Petitioner further argues that Mr. Tinari's failure to make a *proper* objection to a statement by the prosecutor warrants habeas relief. At trial, Judge Byrd admonished Mr. Tinari several times for speaking objections and made clear that attorneys should not state the grounds for their objection. *See, e.g.*, N.T. 02/27/14 at 49 ("Please don't interrupt. If you have an objection, stand and say 'Objection.' I will rule. You know speaking objections are not permitted."). Nevertheless, when the prosecutor asserted during Baker's cross-examination that Baker was "out there killing people," Mr. Tinari objected on the basis that the prosecutor was "yelling and trying to badger the witness." N.T. 02/28/14 (Volume I) at 84. According to Petitioner, the proper bases for the objection was improper character evidence or prosecutorial misconduct. ECF No. 1 at 83. Presumably, had Mr. Tinari simply objected without specifying the reason, as instructed, such an objection would also have been proper in Petitioner's view.

Even if Mr. Tinari's improperly phrased objection constituted a deficient performance on his part, contrary to the Superior Court's analysis, Petitioner fails to show that the prejudice prong of *Strickland* is satisfied. Though it is true that "a prosecutor may not offer his personal beliefs concerning the case to the jury," *Commonwealth v. Rollins*, 738 A.2d 435, 445 (Pa. 1999), any prejudicial effect was eliminated by Judge Byrd's jury instructions. Specifically, the initial jury instructions provided that "the questions which the attorneys ask the witnesses are not evidence[,] [r]ather, it is the witness' answers which provide the evidence for your consideration." N.T. 02/25/14 (Volume II) at 25; *see also* Pa. SSJI (Crim), § 2.09. This principle was reiterated in the

final jury instructions. N.T. 02/28/14 (Volume I) at 116 ("[S]tatements made by the attorneys [do] not constitute evidence and therefore [are] not binding."); *see also* Pa. SSJI (Crim), § 3.16.

Petitioner suggests that the jury should have been specifically prohibited from considering statements of the attorneys and that the "non-binding" language in the instruction did not cure the prejudicial effect of the prosecutor's statement. ECF No. 25 at 21. Importantly, the relevant final jury instruction came squarely between an explanation of direct and circumstantial evidence and the narrow exception for considering attorney statements in the form of stipulated facts as evidence. *Id.* at 114–16. Taken together and in consideration of the initial jury instructions, the jury was aware that the prosecutor's rhetorical question, which was neither direct nor circumstantial evidence, nor a stipulation, should not have been considered as evidence. Moreover, this rule as it pertains to counsel's questioning of witnesses was clearly articulated in the initial jury instructions. Plainly, "[t]he jury is presumed to have followed the court's instructions[,] [t]hus, any improper prejudice that may have arisen from the prosecutor's . . . cross-examination of defense witnesses was adequately cured by the trial court's instructions." *Commonwealth v. Freeman*, 827 A.2d 385, 413 (Pa. 2003) (internal citations omitted); *see also Commonwealth v. Arrington*, 86 A.3d 831, 853 (Pa. 2014) (citing *Commonwealth v. Brown*, 786 A.2d 961, 971 (Pa. 2001)). For this reason alone, the Court presumes there was no prejudicial effect based on Mr. Tinari's failure to properly object to the prosecutor's question. Additionally, the overwhelming evidence against Petitioner, as discussed *supra* Section IV(a), further bolsters this conclusion. Simply, there is not a reasonable probability that, but for Mr. Tinari's failure to properly formulate his objection, the outcome of the trial would have been different. *See Strickland*, 466 U.S at 694.

### d. Cumulative Prejudice

Finally, Petitioner asserts a cumulative prejudice argument. This claim asks whether individual errors that do not independently entitle a petitioner to relief, when viewed collectively, undermined the fundamental fairness of the trial and denied the petitioner due process. *See Fahy*, 516 F.3d at 205. Cumulative errors "are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict," so the petitioner must establish actual prejudice. *Fahy*, 516 F.3d at 205. Accordingly, cumulative review is proper only as to a petitioner's claims which surmount the first prong of the *Strickland* analysis (i.e. that counsel's performance was deficient). *See Smith v. Fisher*, No. 14-cv-2935, 2016 WL 4366974, at *11 (E.D. Pa. Aug. 15, 2016).

The Superior Court's hurried analysis on this argument is, as the Magistrate Judge points out, confusing. Finding that only petitioner's first and second claims were possibly deficient, the court analyzed only whether the combined prejudicial effect of Dickey's testimony (first claim) and evidence related to the source of information regarding the recovered weapon (second claim) provided grounds for relief. Super. Ct. Op. at *22. However, the court mistakenly summarized its analysis by referring to the third claim rather than the second. *Id.* Additionally, though the court correctly articulated the *Strickland* standard throughout its twenty-two-page analysis, it ruled that based on the accumulated prejudice "the outcome of the trial would not have changed." *Id.* As aptly described by the Magistrate, "[w]hether the outcome *would have changed* is a higher burden on the petitioner than whether there was a *reasonable probability that it would have changed*." ECF No. 21 at 34 (emphasis original). However, this reference "is the kind of acceptable 'shorthand reference'" recognized where the Superior Court here "properly articulated the

27

*Strickland* standard elsewhere in its opinion." *Keaton v. Superintendent Green SCI*, 845 Fed. App'x 153, 156 (3d Cir. 2021).

For the sake of completeness, the Court considers the cumulative prejudicial effect of all "errors" raised by Petitioner. The Court observes that Petitioner asserts his claims in order of their declining prejudicial impact—first, the Dickey testimony which took up a substantial portion of the defense case. However, Mr. Tinari deftly rehabilitated Dickey on redirect examination. Indeed, Dickey claimed that he simply went through the motions at his plea hearing in order to receive a negotiated sentence and that he was unaware of what he was agreeing to "in substance." Any prejudicial effect caused by Dickey's testimony was significantly dampened by Mr. Tinari's artful lawyering alone.

Second, Petitioner asserts Mr. Tinari's failure to move *in limine* to prohibit the Commonwealth from introducing evidence that Mr. Tinari was the source of information related to the recovered weapon. Assuming this claim surpassed *Strickland*'s first prong, the prejudicial impact was minimal because the purportedly damaging use of this information was only introduced through the prosecutor's clear speculation. Indeed, the prosecutor's musings were entirely divorced from evidentiary support. For this reason alone, there was a minimal prejudicial impact as to the source of information about the weapon. Finally, the prosecutor's lone assertion that Petitioner was "out there killing people" was a mere blip on the radar of a lengthy trial in which substantial evidence was introduced. And, as discussed, the jury was properly instructed that attorney statements and questions were not evidence.

Accordingly, before any other evidence is considered, the cumulative prejudicial impact of the asserted errors is slight. Of course, looming over this habeas review is the jury's purported difficulty in reaching a verdict. However, for the reasons described *supra* Section IV(a), this

argument is a red herring. Indeed, the length of deliberations appears appropriate when viewed against the substantial evidence put to the jury. Additionally, the Court may only infer which evidence was particularly important based on the jury's conduct. Because the jury resolved its impasse soon after reviewing Jaleesa's testimony, it is apparent that her testimony was most damaging to Petitioner's case. *See* N.T. 03/06/14. In the absence of other information, the Court declines to speculate as to why the jury initially communicated that it was deadlocked.

The Commonwealth's overwhelming evidence provides the final blow to Petitioner's claim. There is no dispute that Petitioner was at the scene of the crime. N.T. 02/28/14 (Volume I) at 61–62. There is no dispute that after learning he was wanted for McClenic's death, Petitioner evaded police for a year. N.T. 02/28/14 (Volume I) at 85. As the Superior Court provided, the circumstances of Petitioner's apprehension also supported an inference of guilt. Additionally, three eyewitnesses identified Petitioner as the shooter. Though Petitioner attempted to undermine the weight of the eyewitnesses' testimony by pointing out inconsequential inconsistencies, their recollections perfectly aligned on the ultimate question of the shooter's identity both immediately after the shooting and at trial. *See* N.T. 02/25/14 (Volume I) at 77 (Jaleesa); N.T. 02/25/14 (Volume I) at 171 (Shavon); N.T. 02/26/14 at 89 (Jeanette).[10] Most importantly, all three women were all familiar with Petitioner based on prior interactions. In addition to his own testimony and that of Dickey, Petitioner presented character testimony from Mr. Meyers, which was marred by Mr. Meyer's unbecoming conduct, and testimony from Ms. Kinard who admitted that she did not see the shooter. 02/28/14 (Volume I) at 10, 48, 51–53.

---

[10] Somewhat persuasively, the Commonwealth notes that this testimony was marked with several of the Third Circuit's hallmarks of credibility. *See* ECF No. 25 at 12 (citing 2019 Report of the U.S. Court of Appeals for the Third Circuit Task Force on Eyewitness Identification, 92 TEMP. L. REV. 1, 78–93 (2019)).

Upon consideration of the entire record, Petitioner has not established a reasonable probability that the result would have been different absent the testimony of Mr. Dickey, evidence of the source of information about the recovered weapon, and the prosecutor's assertion during Petitioner's cross examination. Accordingly, Petitioner is not entitled to habeas relief on his cumulative prejudice claim.

## V.    CONCLUSION

Because the Court finds that Petitioner's rights were not violated and his claims lack merit, the Court denies his Petition and Objections in their entirety and adopts Judge Hey's reasoned Report and Recommendation. Additionally, the Court declines to issue a certificate of appealability. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner has not shown that "reasonable jurists" would find this Court's assessment of the constitutional claims "debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, no certificate of appealability will be issued. An appropriate order follows.

**BY THE COURT:**

**/s/ Chad F. Kenney**
_____
**CHAD F. KENNEY, JUDGE**